

In The
Court of Appeals
Seventh District of Texas at Amarillo

No. 07-26-00027-CV

IN THE INTEREST OF A.T.G., A.G.G., A.G.G. II, A.G.G., AND A.G.G., CHILDREN

On Appeal from the County Court at Law No. 1
Randall County, Texas
Trial Court No. 85462-L1, Honorable Jack M. Graham, Presiding

May 13, 2026

MEMORANDUM OPINION

Before PARKER, C.J., and DOSS and YARBROUGH, JJ.

In this accelerated appeal, Father seeks reversal of the trial court's judgment terminating his parental rights to two of his five children.[1]  By his appeal, Father brings four issues, two pertaining to the children's potential Indian heritage, one raising a due process challenge, and one challenging the sufficiency of the evidence to support the grounds on which the trial court terminated his rights.  We affirm the judgment of the trial court.

---

[1] To protect the privacy of the parties involved, we will refer to the appellant as "Father," and to the children by "C1" and "C2."  *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b).

## BACKGROUND

Two children are the subject of this appeal.[2]  C1 is sixteen years old and C2 is ten. The Texas Department of Family and Protective Services became involved with the family after receiving an intake report in August 2024 alleging Father sexually assaulted C1's friend during a sleepover at their home.  An investigator with Child Protective Services interviewed the children.  C1 shared a pattern of nighttime abuse allegedly committed by Father occurring while she slept.[3]  All five children were removed from the home.[4]

Five weeks before the final hearing, the trial court interviewed C1 and C2 via Zoom, per the request of the children's guardian ad litem.  Only the ad litem was included in the interview.  Father received a transcript of the interview the morning of the final hearing. During the interview, C1 described instances of physical abuse by Father.  She also described what occurred during the August sleepover when someone she thought was her Father touched her friend's private area and "squeezed" her friend's butt.[5]  C1 said she believed her Father had done that to her on many occasions during the night when she was asleep.  She was unsure whether Father committed these acts because she kept her eyes shut out of fear.  She told the court she did not want contact with her Father.

---

[2] Mother and Father have five children together.

[3] C1 also disclosed previous sexual abuse by an uncle.

[4] The children were later returned to their mother's care, and she was named permanent managing conservator for each.  Father was ordered to pay child support for the three younger children.

[5] The record indicates Father had a pending criminal case stemming from these allegations.  The record also shows the friend apparently later said she lied about what Father did to her, leading to C1's statements that she felt like her friend "destroyed her family."  It also led C1 to be "confused" about what happened to her.

During the Zoom hearing, C2 also said he did not want to live with his Father. He described to the court several instances of physical abuse by his Father.

The final hearing was held the next month. Neither of the children testified. C1's friend also did not testify. C1's therapist testified C1 eventually believed her friend "completely lied and has destroyed her family" and that she "still has no idea what really happened." The investigator testified C1 made allegations of sexual abuse against her Father but later said she "was confused."[6] The evidence showed no trauma was found during the SANE examination performed on C1 in August 2024. No evidence documenting other injuries was introduced.

Other evidence presented at the final hearing included testimony that law enforcement had responded to the family home on at least two occasions. One officer testified that in June 2011, the mother told her that Father had "hit her with a belt, hammer, and he had choked her." She had "multiple bruises all over her body" that the officer described as "pretty bad."[7] The mother also said Father had, on previous occasions, hit her with a bat, thrown a brick at her foot, and had made threats to kill her family. Another officer testified that the mother reported an assault in February 2021. She told the officer Father assaulted her and then took her keys and phone and tried to keep her from leaving the home. She reported head and back pain. EMS evaluated her but did not take her to the hospital. No injuries were visible other than redness on her arm. Other evidence

---

[6] The investigator said C1 did not retract the outcries.

[7] The record contains an *Order of Deferred Adjudication* placing Father on community supervision for a period of seven years in relation to the offense against the mother in 2011. His community supervision was later extended for a period of three years.

3

documenting domestic violence by Father to mother was also admitted during the hearing.

Additional evidence presented included counselor testimony. One counselor testified C1 told her about domestic violence between her parents. C1 also described excessive punishment of the children by Father that included spanking that would leave bruises and spanking with a belt, a curtain rod, or a wood or metal pole. She said Father would make the children "stand in corners for hours" and was "angry all the time." She indicated she and C2 "got the brunt of most of it." C1 continued to be fearful of her Father and did not want him home. A court-appointed special advocate testified that C1 had been subject to physical abuse by her Father and had seen him perpetrate it against C2. She said she never wanted to see Father again, even to the point where "she did not even want to be visible online during the court hearing if she was at it at all."

An investigator with the Department testified that C1 told her she had been touched in her breast area and vagina at night while she was asleep. She was not sure who it was because she kept her eyes shut out of fear. The investigator also testified to what happened to C1's friend at the August sleepover. The investigator said when C1 told her mother about it, both her mother and Father denied it happened and stated her Father could not have touched C1's friend because he had been sleeping. Neither parent was cooperative with the ensuing investigation.

Another counselor testified that C2 told her that Father was "a very angry father" and that C2 was "very fearful" of going to back to live with him and was very fearful of Father's aggression. C2 described instances of excessive punishments that included

4

putting C2's head "through a glass" when he was angry with him, a lot of yelling, a lot of aggressive statements, and spanking with a red pole. A court-appointed special advocate for the children testified that C2 "expressed some very deep fears about being around Father." He made outcries of physical abuse by Father to the advocate. When he first met with the advocate, C2 asked if the advocate could get his father's rights terminated. He went on to explain that every time he got in trouble, his father would "spank him to the point of hurting him." Father used a metal rod on him and put his head through glass at least once. C2 said Father did these things to him as well as to a younger sibling.

The advocate for the children opined it was in the best interest of the children that they remain in the mother's home as they were doing very well and "thriving." She recommended that Father's rights be terminated because the "depth of fear that these children have expressed when it comes to him being back in the home is beyond concerning to me." C1 and C2 both have "stated point-blank they never want to see or speak to him again. They do not want him in that home because they are terrified of what he is going to do to them if he is in that home." She further noted the pattern and history of domestic violence between the parents puts the children in danger.

A permanency specialist testified the children "all seem very happy" living with their mother. She is now very attentive to their needs and is doing a "great job." While she needs to make improvements, the children are very comfortable in the home with her. The specialist opined it was in the children's best interest that the mother be named sole managing conservator because the mother is able to provide the children with a "safe, protective, nurturing home." She is meeting their needs. The specialist recommended terminating Father's rights because the children have expressed concerns about being

safe with him and the specialist did not feel he was able to meet their needs or raise them in a safe and normal manner.

A permanency specialist that worked with the family previously testified she also believed the mother should be named sole managing conservator and that Father's rights should be terminated. She expressed concern over the pending criminal charges against Father, as well as concerns about safety of the children with him and a pattern of domestic violence between the parents. She indicated her agreement that Father was not able to provide a safe environment for the children and that he lacked the requisite parental abilities to provide for their needs. She also noted Father had not provided financial support towards the children during the pendency of the case.

The trial court terminated Father's rights to C1 and C2 on the grounds of endangering conditions and endangerment. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E). The trial court also found termination was in the best interest of the children. *See* TEX. FAM. CODE § 161.001(b)(2). A no-contact order was entered pertaining to the children and the mother, prohibiting Father from contact with them.

**ANALYSIS**

Standard of Review and Applicable Law

A parent's right to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). Therefore, we stringently scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the

6

parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). But, "the rights of natural parents are not absolute" and "[t]he rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (citing *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)). Recognizing that a parent may forfeit his or her parental rights by his or her acts or omissions, the primary focus of a termination suit is protection of the child's best interest. *See id.*

In a case to terminate parental rights under section 161.001 of the Family Code, the petitioner must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination, and (2) termination is in the best interest of the child. TEX. FAM. CODE § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* at § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Both elements must be established, and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re K.C.B.*, 280 S.W.3d 888, 894 (Tex. App.—Amarillo 2009, pet. denied). "Only one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d at 362. We will affirm the termination order if the evidence is both legally and factually sufficient to support any alleged statutory ground the trial court relied upon in terminating the parental rights if the evidence also establishes that termination is in the child's best interest. *In re K.C.B.*, 280 S.W.3d at 894–95.

A trial court may order termination of a parent-child relationship if the court finds by clear and convincing evidence that a parent has knowingly placed or knowingly allowed children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children and/or engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the child. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E). Both subsections (D) and (E) require proof of endangerment. *In re K.O.*, No. 07-23-00440-CV, 2024 Tex. App. LEXIS 4561, at *9–10 (Tex. App.—Amarillo June 26, 2024, no pet.) (mem. op.). To "endanger" means to expose the child to loss or injury or to jeopardize the child's emotional or physical health. *Id.* at *10. A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards. *Id.* (citing *J.S. v. Tex. Dep't of Family & Protective Servs.*, 511 S.W.3d 145, 159 (Tex. App.— El Paso 2014, no pet.)). Endanger means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, but it is not necessary that the conduct be directed at the child or that the child suffer injury. *In re K.O.*, 2024 Tex. App. LEXIS 4561, at *10 (citing *In re N.K.,* 399 S.W.3d 322, 330–31 (Tex. App.—Amarillo 2013, no pet.)).

While both subsections (D) and (E) focus on endangerment, they differ regarding the source of the physical or emotional endangerment to the child. *In re K.O.*, 2024 Tex. App. LEXIS 4561, at *10 (citing *In re B.S.T.*, 977 S.W.2d 481, 484 (Tex. App.—Houston [14th Dist.] 1998, no pet.)). Subsection (D) requires a showing that the environment in which the child is placed endangered the child's physical or emotional health. *In re K.O.*, 2024 Tex. App. LEXIS 4561, at *10 (citing *Doyle v. Tex. Dep't of Protective & Regulatory*

*Servs.*, 16 S.W.3d 390, 394 (Tex. App.—El Paso 2000, pet. denied)).  Conduct of a parent or another person in the home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection (D).  *In re K.O.*, 2024 Tex. App. LEXIS 4561, at *10 (citing *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no pet.)).  "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the 'conditions or surroundings' of the child's home" under subsection (D).  *In re K.O.*, 2024 Tex. App. LEXIS 4561, at *10–11 (citing *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g)).  The factfinder may infer from past conduct endangering the children's well-being that similar conduct will recur if the children are returned to the parent.  *In re K.O.*, 2024 Tex. App. LEXIS 4561, at *11.  Therefore, subsection (D) addresses the children's surroundings and environment rather than parental misconduct, which is the subject of subsection (E).  *Doyle*, 16 S.W.3d at 394.

Under subsection (E), the cause of the danger to the children must be the parent's conduct alone, as evidenced not only by the parent's actions, but also by the parent's omission or failure to act.  *In re K.O.*, 2024 Tex. App. LEXIS 4561, at *11 (citing *In re M.J.M.L.*, 31 S.W.3d 347, 350–51 (Tex. App.—San Antonio 2000, pet. denied); *Doyle*, 16 S.W.3d at 395).  To be relevant, the conduct does not have to have been directed at the child, nor must actual harm result to the child from the conduct.  *In re K.O.*, 2024 Tex. App. LEXIS 4561, at *11 (citing *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ)).  Further, termination under subsection (E) must be established on more than a single act or omission; a voluntary,

deliberate, and conscious course of conduct by the parent is required. *In re K.O.*, 2024 Tex. App. LEXIS 4561, at *11 (citing *In re E.P.C.*, 381 S.W.3d 670, 683 (Tex. App.—Fort Worth 2012, no pet.)). The specific danger to the children's well-being need not be established as an independent proposition but may be inferred from parental misconduct. *In re K.O.*, 2024 Tex. App. LEXIS 4561, at *11 (citing *In re B.C.S.,* 479 S.W.3d 918, 926 (Tex. App.—El Paso 2015, no pet.)).

APPLICATION

Issues One and Two—Indian Heritage

By his first two issues, Father contends the Department (1) failed to comply with the requirements of the Indian Child Welfare Act when it had reason to know that the children may be Indian Children and (2) failed to prove beyond a reasonable doubt that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child and failed to include the testimony of qualified expert witnesses as required under 25 U.S.C. § 1912(f). We overrule the issues.

The Indian Child Welfare Act is a federal law that applies in state court cases when a court knows or has reason to know that an Indian child is involved in a child custody proceeding. 25 U.S.C. § 1912(f). The trial court's application of the ICWA is a question of law that we review de novo. *In re W.D.H.,* 43 S.W.3d 30, at 33 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

We find the ICWA is not applicable here. While some documents in the clerk's record indicated information concerning the children's Indian heritage was "pending" or

"unable to determine,"[8] other documentation, including the first amended petition filed by the Department and the trial court's temporary order following full adversary hearing, showed that the court inquired and Indian heritage was denied.[9] *See In re M.T.R.*, 579 S.W.3d 548, 572 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) (reaching same conclusion based on a permanency report that indicated the grandmother had denied Indian status). Therefore, ICWA does not apply, and the Department had no duty to provide testimony related thereto.

Issue Three—Due Process Violation

By his third issue, Father contends the trial court violated his right to due process by employing a fact-finding procedure that undermined the reliability of its clear and convincing determination of predicate grounds for termination by: (1) conducting an ex parte in-camera interview addressing substantive abuse allegations; (2) relying upon statements obtained during that interview in determining predicate grounds; and (3) denying Father a meaningful opportunity to respond by providing the transcript only hours before trial and denying a continuance.

---

[8] Father had, at some point in the past, indicated he had Native American Heritage through the Tiajuans Tribe. However, Father refused an interview, so it was unknown whether he had any affiliation with the tribe. Further, the Tiajuans Tribe is not an entity recognized by Congress. *See* 91 FR 4102 (providing Indian Entities Recognized by and Eligible to Receive Services From the United States Bureau of Indian Affairs).

[9] The Clerk's Record includes a document entitled "Indian Heritage Acknowledgement" in which the box next to the statement "I am the mother/father of the child(ren) subject of this suit and I am a member of the following Indian tribe: _____ out of the State of _____" is checked. The form is signed by the mother but is incomplete. It contains no information about her potential tribal affiliation. No information concerning potential Indian heritage or which tribe either parent might be a part of appears in the record. The affidavit of indigency provided by Father denied Indian Heritage.

11

On the morning of the final hearing, Father filed a motion for production of the transcript of the Zoom interview of the children and for a continuance to allow time to review and respond. The trial court granted the motion for production but denied the motion for continuance. It did so, saying "You've had a month to ask for it." The hearing proceeded despite Father's objections.

After the admission of evidence, the trial court ruled as noted and stated, "So I think everybody can read between the lines of the reason I treated the children—the two oldest children differently, is because I did have that conference with them, and they did stress so strenuously what they want." So not that I usually explain rulings, but that's why I'm—I did what I did as far as the two oldest."

We review the trial court's ruling on a motion for continuance for abuse of discretion. *In re J.A.R.*, 696 S.W.3d 245, 260 (Tex. App.—Houston [14th Dist.] 2024, pet. denied). The trial court's denial of a continuance will not be disturbed unless the record discloses a clear abuse of discretion. *Id.* A trial court abuses its discretion if its decision is arbitrary, unreasonable, and without reference to guiding rules or principles. *Id.* Texas Rule of Civil Procedure 251 provides that a motion for continuance shall not be granted without "sufficient cause supported by affidavit, or by consent of the parties, or by operation of law." *Id.* at 261; TEX. R. CIV. P. 251. Therefore, when a motion is unsupported by verified facts, appellate courts generally presume the trial court did not abuse its discretion in denying the motion. *Id.*

Due process applies in parental termination cases. *In re K.S.L.*, 538 S.W.3d 107, 114–15 (Tex. 2017). The Supreme Court has looked to the due process approach laid

12

out in *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).  Under that approach, we must balance three elements: the private interests at stake, the government's interest in supporting the challenged procedure, and the risk that the procedure will lead to erroneous decisions.  *In re K.S.L.*, 538 S.W.3d at 114.  The private interest of the parents in termination cases is indisputably "a commanding one."  *Id.*  The State's interest in the welfare of the child "means that its interest in a just decision is largely coextensive with the parents' interests."  *Id.*  The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner."  *Mathews*, 424 U.S. at 333.

Father argues the reliance by the trial court on the statements made by C1 and C2 during the Zoom hearing deprived him of the adversarial safeguards necessary to assess credibility.  There was, he contends, no chance to cross-examine the children and thus, no way to determine credibility.  He claims the trial court relied on statements that might not have been credible.  He argues also that the court utilized a more restrictive procedure, i.e., an ex parte in-camera interview, without making any findings concerning necessity or reliability.  Accordingly, he says, the trial court should not have relied on those statements in determining the predicate grounds for termination.  Further, Father contends the trial court erred when it denied his motion for continuance because it denied his rights by preventing him from preparing a defense.  He claims the trial court's actions deprived him of any meaningful opportunity to respond to the credibility-dependent allegations obtained during the ex parte interview of C1 and C2.

We cannot agree.  First, Father did not raise his complaints with the trial court.  Under our appellate rules, "a party must present to the trial court a timely request, motion,

or objection, state the specific grounds therefor, and obtain a ruling." *In re L.M.I.*, 119 S.W.3d 707, 711 (Tex. 2003) (citing TEX. R. APP. P. 33.1). Courts have found similarly in analogous contexts. *See, e.g.*, *In re D.K.*, 696 S.W.3d 787, 793–94 (Tex. App.—Eastland 2024, no pet.) (finding waiver when, although father moved for a continuance, it was not apparent father was attempting to raise a due process challenge).

Second, Father's motion for continuance did not comply with Rule 251. The motion was oral and was not accompanied by a supporting affidavit. TEX. R. CIV. P. 251 (setting forth requirements). A trial court is "presumed to have correctly exercised its discretion when it denies a motion that does not comply with the requirements of Rule 251 of the Texas Rules of Civil Procedure, including not made in writing, verified, or supported by an affidavit." *In re R.F.*, 423 S.W.3d 486, 490 (Tex. App.—San Antonio 2014, no pet.).

Third, the interview of C1 and C2 was properly conducted under section 153.009 of the Texas Family Code. *See* TEX. FAM. CODE § 153.009(a) (providing, "[i]n a nonjury trial or at a hearing, on the application of a party, the amicus attorney, or the attorney ad litem for the child, the court shall interview in chambers a child 12 years of age or older and may interview in chambers a child under 12 years of age to determine the child's wishes as to conservatorship or as to the person who shall have the exclusive right to determine the child's primary residence"). Importantly, the court was permitted to "interview the child[ren] in chambers to determine the child[ren]'s wishes as to possession, access, or any other issue in the suit affecting the parent-child relationship." TEX. FAM. CODE § 153.009(b). This extended to allegations underlying the potential termination of Father's rights that the trial court could consider in its determination. *See* *In re C.J.*, 698 S.W.3d 417, 423 (Tex. App.—Dallas 2024, no pet.) (noting a trial judge

14

can credit and rely on facts related by the children in an interview just like any other evidence).

Moreover, the interview took place over a month prior to the final hearing. Father had sufficient time to request the transcript. Further, the allegations contained therein were not new and therefore not a surprise to Father. He already knew such allegations were part of the case and that he would need to prepare to address those allegations. Father has not shown harm or prejudice resulting from the denial of his motion. *See In re Z.J.C.*, 440 S.W.3d 42, 47 (Tex. App.—Waco 2009, no pet.) (finding denial of motion for continuance proper when there was, among other things, no showing of harm).

Lastly, the trial court had sufficient grounds on which to terminate Father's parental rights based on other evidence admitted at the final hearing as discussed in detail herein. The record shows Father was not deprived of a meaningful opportunity to respond to the allegations set forth.

We resolve this issue against Father.

Issue Four—Sufficiency of Evidence to Support Grounds

In his last issue, Father argues the evidence was legally and factually insufficient to support termination under section 161.001(b)(1)(D) and (E) or under section 161.001(b)(2) because the findings of endangerment rested on recanted, credibility-dependent allegations that were relayed through third parties and unsupported by objective or direct evidence and the remaining reliability-tested evidence was insufficient. We overrule the issue.

15

Father argues the evidence was legally and factually insufficient to support the trial court's termination of his parental rights to C1 and C2 because without the statements made during the Zoom interview, the sole allegation of sexual abuse was recanted, contradicted by a SANE examination that found no trauma, and made by C1 who said she did not see the person who assaulted her and who stated she was "confused." Moreover, Father contends, the allegations of physical abuse consist of uncorroborated hearsay by witnesses who never saw injuries and were unsupported by medical, photographic, or other evidence. We cannot agree.

First, as discussed in the previous issue, the trial court could take the information relayed in the children's interviews into consideration in making its determination. *See In re A.C.*, 387 S.W.3d 673, 677 (Tex. App.—Texarkana 2012, pet. denied) (information obtained by the trial court in such an interview is strictly supplemental to the evidence taken in court, the purpose of the interview being to aid the court in making its determination). Next, sexual or physical abuse of a child is clearly conduct that endangers a child under section 161.001(b)(1)(D) and (E), *In re S.A.*, No. 13-25-00448-CV, 2026 Tex. App. LEXIS 1100, at *14–16 (Tex. App.—San Antonio Feb. 5, 2026, no pet.) (mem. op.), and a child's outcry statement alone is sufficient to support an endangerment finding. *In re M.H.*, No. 05-22-00017-CV, 2022 Tex. App. LEXIS 5631, at *16 (Tex. App.—Dallas Aug. 5, 2022, no pet.) (mem. op.).

Second, the record contains ample testimony from various witnesses setting forth sufficient evidence supporting the grounds for termination determined by the trial court.[10]

---

[10] Father did not fully brief his contentions concerning best interest. He did not discuss any of the applicable factors. *See* TEX. R. APP. P. 38.1 (setting forth briefing requirements). The failure to provide

There is no requirement that witness testimony be corroborated or supported by medical, photographic, or other evidence. Testimony alone is sufficient. *See In re R.D.S.*, 902 S.W.2d 714, 716 (Tex. App.—Amarillo 1995, no writ) (noting that the reviewing court must recall that the trier of fact has the authority to weigh the evidence, draw reasonable inferences therefrom, choose between conflicting inferences, and may freely choose to believe all, part, or none of the testimony espoused by any witness). The evidence included not only witness testimony but also criminal history records and therapy notes. That evidence detailed the allegations made by C1 and C2, the domestic violence in the home, and Father's criminal history. *See In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) ("[d]omestic violence, want of self control, and propensity for violence may be considered as evidence of endangerment"); *In re K.O.*, 2024 Tex. App. LEXIS 4561, at *10–11 (similar discussion).

We conclude that the evidence detailed herein, taken together, is sufficient to support the trial court's finding of endangering conditions and endangerment by Father. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E). The trial court, as the sole judge of the credibility of the witnesses and the weight to give to their testimony, was entitled to choose to believe one witness and disbelieve another with respect to the disputed facts of this case. *In re C.E.*, 687 S.W.3d 304, 314 (Tex. 2024). *See also In re B.R.*, 950 S.W.2d 113, 121 (Tex. App.—El Paso 1997, no writ) (where conflicting evidence is present, the factfinder's determination on such matters is generally regarded as conclusive). Under

---

substantive analysis waives an issue on appeal. *In re P.J.G.*, No. 13-24-00087-CV, 2026 Tex. App. LEXIS 587, at *4 (Tex. App.—Corpus Christi Jan. 26, 2026, no pet.) (mem. op.). Nevertheless, we find the evidence sufficient to support the trial court's finding that termination was in the children's best interests.

the governing standard of review, courts must defer to the factfinder's resolution of these disputes. *Id.*

## CONCLUSION

Having overruled each of Father's issues, we affirm the final judgment of the trial court.

Alex Yarbrough
Justice
